**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **SHELLY K. BASQUEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CIV-06-487-SPS** |
| | ) | |
| **EAST CENTRAL OKLAHOMA** | ) | |
| **ELECTRIC COOPERATIVE, INC.,** | ) | |
| **NATIONAL RURAL ELECTRIC** | ) | |
| **COOPERATIVE ASSOCIATION,** | ) | |
| **NATIONAL RURAL ELECTRIC** | ) | |
| **COOPERATIVE ASSOCIATION** | ) | |
| **GROUP BENEFITS PROGRAM,** | ) | |
| **and COOPERATIVE BENEFITS** | ) | |
| **ADMINISTRATORS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER GRANTING
SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS**

The Plaintiff Shelly K. Basquez brought this action against her employer East Central Oklahoma Electric Cooperative, Inc. ("ECOEC"), the National Rural Electric Cooperative Association ("NRECA"), the National Rural Electric Cooperative Association Group Benefits Program, and Cooperative Benefit Administrators, Inc. ("CBA"), pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 - § 1461 ("ERISA"), seeking to enforce her rights and recover benefits under her long-term disability ("LTD") plan. *See* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"). The Defendants filed the administrative record regarding the Plaintiff's

claim for LTD benefits to which the Plaintiff objected because it was missing documents that had previously been provided by the Defendants to the Plaintiff, *i. e.*, documents that were part of the Plaintiff's claim file. *See* Docket No. 35. The Court took the Plaintiff's Motion Objecting to the Administrative Record filed by Defendants [Docket No. 35] under advisement. *See* Docket No. 39. The parties have now filed cross-motions for summary judgment addressing the Defendants' handling of the Plaintiff's claim. *See* Docket Nos. 45 & 46. For the reasons set forth herein, the Court finds that the Motion for Summary Judgment by Defendants ECOEC, NRECA, CBA, and NRECA Group Benefits Program [Docket No. 46] should be granted and the Plaintiff's Motion Objecting to the Administrative Record Filed by Defendants [Docket No. 35] and the Plaintiff's Motion for Summary Judgment and Opening Brief in Support [Docket No. 45] should be denied.

## I. BACKGROUND

ECOEC maintains an employee welfare benefit plan through the NRECA Group Benefits Program ("the Plan"). NRECA sponsors the Plan, which among other things, provides eligible employees of its members, *e. g.*, employees of ECOEC, with benefits in the event of total disability. The Plan includes NRECA's self-insured LTD Plan, an "employee welfare plan" under § 3(1) of ERISA, 29 U.S.C. § 1002(1). The LTD Plan is funded by contributions from participating rural electric cooperatives which are paid into the NRECA Group Benefits Trust until disbursed to participants of the Plan. CBA, a wholly-owned subsidiary of NRECA, is the named fiduciary of the LTD Plan under ERISA, 29 U.S.C. § 1102(a), and the claims adjudicator (Tr. 11). The Plan grants the NRECA Insurance and

Financial Services Committee, the Plan Administrator, *i. e.*, the Director of the Retirement, Safety and Insurance Department of NRECA, and CBA "the discretion and final authority to interpret and construe the terms of the Plans [and] to determine coverage and eligibility for benefits under the Plans[.]" (Tr. 14, ¶ 9.07).  The LTD Plan Summary indicates that "CBA's judgment as to the terms of the Plan . . . shall be final and determinative." (Tr. 181). The Plan defines a participant as "totally disabled" if he "(i) due to sickness or accidental bodily injury [is] (A) completely unable to perform any and every duty pertaining to the Participant's occupation with the Participating Cooperative, and (B) after two years measured from the end of the Benefit Waiting Period, [is] completely unable to engage in any and every gainful occupation for which the Participant is reasonably fitted by education, training or experience, and (ii) not engaged in any Gainful Occupation and is not confined in a penal institution or other house of correction as a result of conviction for a criminal or other public offense." (Tr. 21, ¶ 2.01).

The Plaintiff was employed by ECOEC as a computer-aided drafting ("CAD") technician for nearly twenty years until July 26, 2005, when she quit working because of chronic headaches and sleep apnea.  At all times relevant to this lawsuit, the Plaintiff was a participant of the LTD benefit plan offered by ECOEC to its employees.

The Plaintiff's earliest medical records show that she has suffered from chronic headaches for several years (Tr. 186).  In 1997, she reported to her physician that she worked full-time as a CAD technician and that although her headaches were "aggravated by loud noises, emotional stress, bending forward, drinking liquor, and weather changes[,] [she]

remain[ed] very active." (Tr. 280-82). As early as 1998, the Plaintiff's headaches were affecting her sleep, and she was labeled as a chronic opiate user because of her headaches (Tr. 286). In 1999, medical records show the Plaintiff "ha[d] reasonable control of her headaches and cervicalgia on her current dose of medication." (Tr. 289). By April 2000, the Plaintiff complained of side effects from her medication, so she was prescribed Methadone to control her pain (Tr. 291), and within a few months, she reported to her physician "significant improvement" from taking it (Tr. 292). In January 2001, the Plaintiff's physician noted that although the Plaintiff continued to have daily headaches, the Methadone "help[ed] decrease her pain by approximately 50% and allow[ed] her to continue working." The benefits of the medication outweighed the "mild sedation" it caused (Tr. 295). By November 2001, the Plaintiff reported "that overall she [was] doing about the same and continue[d] to function and work on her current medication regimen." (Tr. 298). She did, however, receive a verbal reprimand for sleeping at her desk in October 2001 (Tr. 191), and her Employee Progress Appraisal Form for the period from January 2001 through January 2002 revealed that in addition to problems staying awake, the Plaintiff needed to have fewer interruptions, *e. g.*, fewer personal phone calls and visitors, and better concentration (Tr. 193-95).

In April 2002, the Plaintiff began seeing Dr. David A. Traub, M.D., with complaints of headaches and problems sleeping. Dr. Traub referred her to Dr. Stanley Skarli, M.D., for evaluation for possible symptomatic hydrocephalus (Tr. 300). Dr. Skarli reviewed the Plaintiff's CT scan and noted that it showed "mildly enlarged ventricles and a mega cisterna

magna," but an MRI report indicated that "there was no evidence of hemorrhage surrounding it." He concluded that the CT showed "no evidence for overt hydrocephalus" but the Plaintiff might suffer from "compensated hydrocephalus" and suffered from "a history of a venous angioma." There was not much Dr. Skarli could do for the Plaintiff since "[v]enous angiomas [were] typically not surgically treated as removal of them often [led] to venous infarctions," but he did not believe that the Plaintiff's venous angioma was responsible for her chronic headaches (Tr. 273-74, 276).

In September 2002, Dr. Traub also referred the Plaintiff to Dr. Richard Bregman, M.D., for a sleep study. The study revealed that she suffered from obstructive sleep apnea syndrome, and Dr. Bregman recommended the use of a CPAP machine (Tr. 271-72). In December 2002 and March 2003, the Plaintiff reported to Dr. Traub that the CPAP machine was helping her (Tr. 267-68).

The Plaintiff received another performance evaluation for the period from February 2002 through February 2003. Her supervisor rated the quality of her work as excellent, and although the Plaintiff had improved, she was still sleeping on the job and had too many other distractions, *e. g.*, personal phone calls needed to be "reduced significantly." (Tr. 196-99). On an evaluation for the period from January 2003 through December 2003, the Plaintiff showed some improvement and "ha[d] done better about not sleeping on the job." She took a long time to complete tasks, which her supervisor equated with her still having too many interruptions (Tr. 200-03).

In June 2004, the Plaintiff returned to Dr. Bregman for another sleep study. She continued to suffer problems of persistent "daytime somnolence" but had been using Provigil, which had significantly improved her condition. The Plaintiff's pressure was adjusted in the hope of further improving her condition (Tr. 258-59). When the Plaintiff saw Dr. Traub in September 2004, he reported that her pain syndrome was stable (Tr. 255). Dr. Traub referred the Plaintiff to Dr. Jeffrey Watts, M.D., for an MRI of the brain. Dr. Watt's impression was that the cuvilinear enhancement on the Plaintiff's left frontal lobe was "very likely a small venous angioma," but there was no evidence of any hemorrhage or other complication (Tr. 254).

The Plaintiff was evaluated by her supervisor for the period from January 2004 through January 2005. The evaluation showed that the Plaintiff continued to sleep on the job, but she also did not make good use of her time, took too long to complete tasks, and conducted too much personal business on company time. Her absences were creating an excessive back log of work. Overall, it was noted the Plaintiff could do her job, but she "allowed [her] personal and social life to get in the way[.]" (Tr. 204-07). Shortly after her evaluation, Dr. Bregman provided the Plaintiff's supervisor with a letter explaining that her daytime sleepiness was caused by her sleep apnea and that he hoped to resolve the problem with treatment (Tr. 209). During this time, the Plaintiff was also seen by Dr. Traub, and she reportedly had no new symptoms and everything was stable (Tr. 252).

The Plaintiff underwent surgery for severe right carpal tunnel syndrome with thenar denervation in February 2005 (Tr. 248-51). She took leave under the Family Medical Leave

Act (Tr. 349-53) and was released to return to work with no restrictions in May 2005 (Tr. 242, 322). In July 2005, however, the Plaintiff requested additional leave under FMLA to begin in August and continue through September 9, 2005 (Tr. 366-67). On August 3, 2005, Dr. Traub completed an Attending Physician's Statement of Disability ("APS") for the Plaintiff, noting her conditions included chronic severe headaches and sleep apnea resulting in somnolence for which she took Methadone and Ambien. He rated her progress as "unchanged" and found she had a class 4 disability or moderate limitation of functional capacity and limitation to sedentary activity. He remarked that she needed occasional time off because of her headaches and sleep apnea, but she was not totally disabled from performing her job or any other work. He did not expect a fundamental or marked change in her condition in the future (Tr. 377-78). Further, on the FMLA certification form he completed on August 11, 2005, Dr. Traub concluded the Plaintiff had a category 4 serious health condition (a chronic condition requiring treatment), including chronic headaches, sleep apnea, and hydrocephalus. He opined that her conditions were likely permanent and that she needed approximately two days off per month because of her headaches. He also answered "no" about whether the Plaintiff was unable to perform work of any kind (Tr. 338-42, 362-65).

The Plaintiff requested further leave under FMLA on August 23, 2005, through September 20, 2005 (Tr. 372-73). Dr. Traub completed a FMLA certification form on that date indicating that the Plaintiff still suffered from a category 4 serious health condition that now included pancreatitis. He opined that the Plaintiff would need to be off work until

further notice (Tr. 230-33, 368-71). However, on September 20, 2005, Dr. Traub completed a second APS, noting additional impairments of pancreatitis and fibromyalgia, and he determined that the Plaintiff had a class 5 disability or that she had severe functional limitations and was incapable of minimal sedentary activity. He concluded that the Plaintiff was totally disabled from performing her current job (and any other work) and did not expect her condition to improve (Tr. 375-76).

On September 19, 2005, the Plaintiff applied for LTD benefits under the Plan. She complained that daily headaches and sleep apnea kept her from performing the daily tasks of her job and explained that although she had been working in her condition for several years, she had reached the point that she could no longer work (Tr. 380-83). ECOEC confirmed the details of the Plaintiff's application, *e. g.*, her name, position, dates of employment, pay rate (Tr. 384-85), and then submitted it to CBA (Tr. 346). By letter dated September 27, 2005, CBA claims specialist Mick Eglsaer informed the Plaintiff that her application for LTD benefits had been received and that CBA had requested additional information from her physicians (Tr. 345). Further, on October 28, 2005, ECOEC terminated the Plaintiff's employment for "medical disability - FMLA expended." (Tr. 210).

After receiving the Plaintiff's medical records, her claim was referred by CBA to ProPeer Resources, Inc. ("PPR") for an independent physician review of her medical records. In the November 2005 report from the board certified internal medicine physician, it was determined that the Plaintiff had suffered from chronic headaches for several years and "was maintaining her employment until August 2005 when she was hospitalized for pancreatitis."

Her pancreatitis had since resolved but she continued to have headaches for which she took methadone and had sleep apnea. The reviewing physician noted that the "pattern of her headaches" had not changed and her sleep apnea "[was] very well controlled on her CPAP." On many prior occasions, the Plaintiff had been "released to work without any restrictions." In the physician's opinion, "[t]here [was] nothing in the provided records that substantiate[d] [the Plaintiff was] unable to perform any of the duties of her current job beyond the four to six weeks after her pancreatitis onset." (Tr. 219-20). Upon return of the report from PPR, Mr. Eglsaer notified the Plaintiff by letter dated November 11, 2005, that her initial claim for LTD benefits was denied because "there was no objective medical information to substantiate your total disability from performing the duties of your own occupation beyond four to six weeks following the date you first left work on August 26, 2005." (Tr. 214-15).

The Plaintiff appealed the denial of her claim by letter dated May 5, 2006 (Tr. 159-63). A PPR physician again reviewed the Plaintiff's medical records and found "that the pancreatitis has resolved, the sleep apnea is in control with CPAP and the headaches have not changed nor has the treatment changed for a number of years." He also found there was no "neurologic finding showing that she is not able to work due to hydrocephalus and in fact neurological examinations are normal and it appears that she does not have normal pressure hydrocephalus." The physician concluded "there is no evidence that she is disabled from her usual occupation[.]" (Tr. 217-18). Based on the Plaintiff's medical records and the physicians' independent review thereof, CBA denied the Plaintiff's appeal and gave her sixty days to file a final appeal with the Appeal Committee (Tr. 333, 153-54), which she did by

letter dated August 4, 2006 (Tr. 156-58). The Appeal Coordinator notified the Plaintiff on October 6, 2006, that "[b]ased on [the Appeal Committee's] review of the file and the opinions expressed by the consultants, the Appeal Committee has determined that she would not meet the plan definition of 'totally disabled' from her own occupation and would, therefore, not be eligible for disability benefits." (Tr. 137-38). Having exhausted her administrative remedies under the Plan, the Plaintiff sought judicial review of the denial of benefits pursuant to 29 U.S.C. § 1132.

## II. ANALYSIS

Both parties have moved for summary judgment. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "ha[s] the burden of showing the absence of a genuine issue as to any material fact," and the evidence "must be viewed in the light most favorable to the [nonmoving party]. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) [citation omitted].

The summary judgment standard does not change simply because the parties have filed cross-motions. *See James Barlow Family Limited Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998) ("Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no

evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."), *citing Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981). But in a case such as this, *i. e.*, an action for benefits under an ERISA plan, conflicting evidence on the issue of disability does not defeat summary judgment because the motions are "more accurately considered as an appeal from an administrative decision." *See Omasta v. The Choices Benefit Plan*, 352 F. Supp. 2d 1201, 1206 (D. Utah 2004). Conflicting evidence is only a factor to consider. *Id*. at 1206-07 ("[I]n making its determination of whether the decision was arbitrary and capricious, the presence of conflicting evidence on the disability issue is a factor that the court considers in making its determination of whether the administrator's decision to deny benefits was arbitrary and capricious. In making its decision, the court may affirm the administrator's decision, reverse that decision and award benefits, or remand for further proceedings."), *citing Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1289 (10th Cir. 2002). *See also Ralston v. Suiza Dairy Group, L.P.*, 2006 WL 2917343, *slip op.* at *10 (N.D. Ind. Oct. 10, 2006) ("'Although the parties' motions are summary judgment motions, the motions actually seek administrative review of the decision to deny benefits, with the composition of the administrative record being the essential uncontested fact.'") [unpublished opinion], *quoting Shyman v. UNUM Life Insurance Co. of America*, 2004 WL 609280, at *2 (N.D. Ill. Mar. 25, 2004) [unpublished opinion], *aff'd*, 427 F.3d 452 (7th Cir. 2005).

As discussed above, the Plaintiff's Motion Objecting to the Administrative Record Filed by Defendants [Docket No. 35] also remains pending. Taken together, the three motions raise several issues: (i) whether any of the Defendants should be dismissed as improper parties; (ii) whether the administrative record should be supplemented; (iii) whether any procedural irregularities or a conflict of interest would require a less deferential review of CBA's decision denying LTD benefits than would otherwise apply; and, (iv) whether the decision of the CBA satisfies the appropriate standard of review.

## A. ECOEC is not a proper defendant to this ERISA action.

The Defendants argue that CBA (the named administrator of the Plan) is the only proper defendant in this action, *i. e.*, that ECOEC and NRECA should be dismissed. The Plaintiff observes that there is no Tenth Circuit authority exempting an employer and its plan sponsor from an action for benefits under ERISA, and that both ECOEC and NRECA are delegated duties under the Plan, *e. g.*, ECOEC has responsibility over the administration of the Plan and NRECA is designated as having general management, administration, and control of the Plan. The Court finds that ECOEC is not a proper defendant to this action but declines to do so with respect to NRECA.

Section 1132(a)(1)(B) sets forth who can bring a civil action under ERISA but "does not specify against whom such an action may be brought. Nonetheless, because of the type of relief available, the proper defendant to an ERISA action brought by plan participants to recover benefits due is the entity which controls the ultimate decision to pay or not pay benefits." *Niles v. American Airlines, Inc.*, 2007 WL 30607, *slip op.* at *2 (D. Kan. Jan. 3,

2007) [unpublished opinion], *aff'd in part and vacated in part on other grounds*, 2008 WL 711630 (10th Cir. Mar. 17, 2008). The Plan provides that CBA shall determine "all claims for benefits" and that "CBA's judgment as to the terms of the Plan . . . shall be final and determinative." (Tr. 11, ¶ 8.01, 181). But the Plan gives no direct or indirect control over these functions to ECOEC, so it is not a proper defendant. *See, e. g., Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir.), *cert. denied*, 488 U.S. 826 (1988) ("Unless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits."), *citing Boyer v. J.A. Majors Co. Employees' Profit Sharing Plan*, 481 F. Supp. 454, 457-58 (N.D. Ga. 1979). *See also Layes v. Mead Corp.*, 132 F.3d 1246, 1249 (8th Cir. 1998) (finding employer was not a proper defendant in an action for ERISA benefits because it did not control administration of the plan), *citing Garren v. John Hancock Mutual Life Insurance Co.*, 114 F.3d 186, 187 (11th Cir. 1997) ("The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan."); *Miller v. Pension Plan for Employees of Coastal Corp.*, 780 F. Supp. 768, 773 (D. Kan. 1991), *aff'd on other grounds*, 978 F.2d 622 (10th Cir. 1992), *cert. denied*, 507 U.S. 987 (1993) (granting summary judgment for a defendant employer in an action to recover benefits "for the additional reason that it is not a proper party"). ECOEC is therefore entitled to summary judgment and shall be dismissed herefrom pursuant to Fed. R. Civ. P. 21.

NRECA, on the other hand, has been delegated some duties under the Plan, *e. g.*, the Plan Administrator is the Director of the Retirement, Safety and Insurance Department of NRECA (Tr. 13, ¶ 9.03); the NRECA Insurance and Financial Services Committee appointed

by the President of NRECA controls general management and administration of the Plan "including management and control of the assets of the Program" (Tr. 12-13, ¶ 9.01); and the Plan grants "the Committee, the Plan Administrator and CBA and their delegates . . . discretion and final authority to interpret and construe the terms of the Plans; to determine coverage and eligibility for benefits under the Plans; to adopt, amend, and rescind rules, regulations and procedures pertaining to their duties under the Plans, and the administration of the Plans; and to make all other determinations deemed necessary or advisable for the discharge of their duties or the administration of the Program." (Tr. 14-15, ¶ 9.07). Further, NRECA may acquire fiduciary status for the Plan if "fiduciary functions set forth in ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)" are present. *In re Luna*, 406 F.3d 1192, 1201 (10th Cir. 2005). A fiduciary is one who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets[.]" 29 U.S.C. § 1002(21)(A)(i). NRECA would seem to be charged with such functions under the Plan, *i. e.*, "authority for and control of, management of the Program, including management and control of the assets of the Program." (Tr. 12-13, ¶ 9.01). *See Curcio v. John Hancock Mutual Life Insurance Co.*, 33 F.3d 226, 233 (3d Cir. 1994) ("Our task, simply stated, is to resolve whether Capital Health maintained any authority or control over the management of the plan's assets, management of the plan in general, or maintained any responsibility over the administration of the plan."). *But see Yergin v. National Rural Electric Cooperative Association*, No. 1:06cv1047, at *8 (E.D. Va. Mar. 21, 2007) ("NRECA has delegated full and final authority to interpret the

-14-

provisions of the NRECA Medical Plan, as well as to determine the eligibility of participants to receive benefits to CBA. Since NRECA is neither the plan nor the plan's administrator responsible for deciding benefit claims, NRECA is not a proper party defendant and is entitled to summary judgment."). The Court declines, however, to address this disputed issue because, as is discussed below, CBA's decision to deny the Plaintiff's claim is supported by substantial evidence. *See Adamson v. UNUM Life Insurance Co. of America*, 455 F.3d 1209, 1213 n.1 (10th Cir. 2006) ("We resist the invitation . . . to attempt to discern whether UNUM acted as a claim administrator or plan administrator, because our review of the administrative record persuades us that under either alternative the contested decision must be upheld.").

### B. The scope of the Court's review is limited to the administrative record.

The Plaintiff contends that the administrative record in this case is incomplete and should be supplemented with additional documents contained in the claim file maintained by CBA.[1] She argues that she was denied the "full and fair review" guaranteed by ERISA because the processing of her claim was "fraught with procedural irregularities" and because there is a conflict of interest inherent in the agreement between CBA and PPR. *See generally* 29 U.S.C. § 1133(2) ("[E]very employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair

---

[1] The documents that the Plaintiff contends were improperly excluded from the administrative record include: (i) a draft denial letter of the Plaintiff's first level appeal which appears to initially have been prepared by claims specialist Mick Eglsaer and then later signed by Pam Zimbelman; (ii) a November 2005 request from Mick Eglsaer to PPR for a medical review with fax cover sheet; (iii) a May 2006 request from Mick Eglsaer to PPR for a medical review; (iv) emails between CBA employees regarding Plaintiff's attorney's request for the claim file and the required authorization form; and, (v) an email regarding the review of the Plaintiff's first level appeal.

review by the appropriate named fiduciary of the decision denying the claim."). *See also Sandoval v. Aetna Life and Casualty Insurance Co.*, 967 F.2d 377, 382 (10th Cir. 1992) ("[R]eceiving a 'full and fair review' requires 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'"), *quoting Sage v. Automation, Inc. Pension Plan & Trust*, 845 F.2d 885, 893-94 (10th Cir. 1988) [internal quotations omitted]. The Plaintiff maintains that these factors justify the consideration of extrinsic evidence, *e. g.*, the documents omitted from the administrative record, in order to determine whether to apply a relaxed "arbitrary and capricious" standard of review. *See, e. g., Fought v. UNUM Life Insurance Co. of America*, 379 F.3d 997, 1007 (10th Cir. 2004), *cert. denied*, 544 U.S. 1026 (2005) ("[W]hen an inherent conflict of interest, or a serious procedural irregularity exists, . . . and the plan administrator has denied coverage, the district court is required to slide along the scale considerably and an additional reduction in deference is appropriate."). *See also McGraw v. Prudential Insurance Co. of America*, 137 F.3d 1253, 1258 (10th Cir. 1998) ("[T]he degree of deference to accord such a decision will be decreased on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible.") [citations omitted].

Generally, "[w]hen applying the arbitrary and capricious standard of review, it is plain error to supplement the administrative record with extrinsic evidence." *Miller v. Cingular Wireless LLC*, 2007 WL 14675, at *2 (N.D. Okla. Jan. 3, 2007) [unpublished opinion], *citing*

*Geddes v. United Staffing Alliance Employee Medical Plan*, 469 F.3d 919 (10th Cir. 2006) (remanding ERISA claim to the district court, because the court was only allowed to consider extrinsic evidence, *e. g.*, deposition testimony and physician's affidavit, for *de novo* review of an ERISA claim and not under the arbitrary and capricious standard). *See also Sandoval*, 967 F.2d at 381 ("In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.") [citations omitted]; *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 823 (10th Cir. 1996) ("[T]he reviewing court may consider only the evidence that the administrators themselves considered.") [citations omitted]; *Hall v. UNUM Life Insurance Co. of America*, 300 F.3d 1197, 1201 (10th Cir. 2002) ("[T]he federal courts are limited to the 'administrative record'-the materials compiled by the administrator in the course of making his decision.") [citations omitted]. However, evidence outside the administrative record is sometimes admitted if there is a procedural irregularity or a conflict of interest, but such "evidence should only be admitted to the extent that the party seeking its admission can show that it is relevant to the conflict of interest and that the conflict of interest in fact requires the admission of the evidence." *Hall*, 300 F.3d at 1205. *See also Omasta*, 352 F. Supp. 2d at 1205 (noting that "[a] court is not always restricted to the administrative record when applying an arbitrary and capricious standard if the record shows that defendant had knowledge of additional and readily available information that may have shown an entitlement to benefits.").

## 1. Procedural irregularities

The Plaintiff contends she was denied a "full and fair review" of her claim by the exclusion of the omitted documents from the administrative record. She contends there were other procedural irregularities as well: (i) the same claims specialist, Mick Eglsaer, who denied her initial application for LTD benefits, also denied her first level appeal in violation of ERISA regulations; (ii) CBA required "objective medical documentation" for her LTD claim; and, (iii) the denial of her final appeal only referenced evidence from the PPR physicians (and not her treating physicians). The Plaintiff concludes that these irregularities warrant the supplementation of the administrative record and the application of the relaxed arbitrary and capricious standard.

The Court finds these arguments unpersuasive. First, the failure to include the omitted documents in the administrative record does not amount to a procedural irregularity serious enough to warrant supplementation of the record or application of the relaxed arbitrary and capricious standard. The ERISA regulations require that claims procedures "[p]rovide . . . a claimant . . . reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). A document or record is considered relevant if it "[w]as relied upon in making the benefit determination [or] [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination[.]" *Id.* § 2560.503-1(m)(8)(i-ii). The Plaintiff does not dispute she had access to all the documents in her claim file. Further,

although the administrative record does not contain all these documents, the Plaintiff has not shown that the ones omitted played any role in CBA's decision to deny her benefits. At most, the omitted documents are administrative in nature and do not appear to include any information on which a denial of her LTD benefits was based. *See Garner v. US West Disability Plan*, 2006 WL 894889, at *4 (D. Colo. Mar. 31, 2006) ("Further, neither of the documents . . . played a role in the decision to deny LTD benefits. . . . [T]he Court finds the omissions here insignificant and undeserving of a slide down the *Fought* scale. Considerable evidence exists in the record to support defendant's position that neither [excluded document] played a role in Ms. Garner's denial of benefits.") [citation omitted] [unpublished opinion].[2]

Second, the administrative record *does* suggest that Mr. Eglsaer was involved in both the original denial of benefits (Tr. 151) and the initial appeal (Tr. 150). And the documents contained in the Plaintiff's claim but omitted from the administrative record *do* seem to support this suggestion.[3] But this does not mean the Plaintiff was denied the "full and fair

---

[2]      The Defendants observe that the Plaintiff was represented throughout the appeal process by the same attorney who represents her herein and contend that if he was unhappy with the administrative record before the Appeal Committee, he should have objected then. *See, e. g., Sandoval*, 967 F.2d at 382 ("[T]he Review Committee invited Sandoval to submit additional evidence. . . . Sandoval had the opportunity to submit additional evidence . . . to the Review Committee but declined to do so. . . . The Review Committee had no affirmative duty to rule out a claim not before it."). The Plaintiff admits her attorney had the entire claim file during the appeal (including the omitted documents she now proffers) but contends he had no reason to know that the Appeal Committee would not be considering all of the documents contained therein. While it seems doubtful the attorney could not have discovered the administrative record actually before the Appeal Committee, the Court declines to find any waiver here.

[3]      For example, the draft denial letter included Mr. Eglsaer's name on the signature line, but it was later crossed out and replaced with the name of the Director of Claims Administration for

review" required by ERISA because Mr. Eglsaer was *not* involved in the final appeal to the CBA Appeal Committee. *See* 29 C.F.R. § 2560.503-1(h)(3)(ii) ("[T]he claims procedures . . . [p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual[.]"). Clearly there was substantial compliance with the regulation. *See Hickman v. GEM Insurance Co.*, 299 F.3d 1208, 1215 (10th Cir. 2002) ("Substantial compliance with the requirements of [29 U.S.C.] § 1133 is sufficient."), *citing Sage*, 845 F.2d at 893, 895. *See also Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) ("[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious.").

Finally, the Plaintiff's arguments that CBA required "objective medical documentation" to support her functional impairment and that the denial of her final appeal only considered the reports from the PPR physicians (and not her treating physicians) do not violate her right to a "full and fair review" of her claim or amount to procedural irregularities requiring the application of the relaxed arbitrary and capricious standard of review.[4]

_____

CBA, Pam Zimbelman. It is also mentioned that Mr. Eglsaer's name was on the draft denial letter in emails exchanged between Ms. Zimbelman and another CBA employee Pam Nicholson-Sanders. No reason was given, but it was noted that his name would be removed from the letter before it was mailed out and that Ms. Nicholson-Sanders had reviewed the file to confirm Ms. Zimbelman's recommendation that the Plaintiff's appeal be denied.

[4] ERISA regulations require the claims procedures "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant

Although "subjective evidence of disability" can be considered in ERISA cases, *see Ray v. UNUM Life Insurance Co. of America*, 224 Fed. Appx. 772, 786-87 (10th Cir. 2007) [unpublished opinion], the adjudicator "is not required to give more weight to plaintiff's testimony than to the other evidence in the record." *Niedens v. Continental Casualty Co.*, 2007 WL 956647, *slip op.* at *7 (D. Kan. Mar. 28, 2007) [unpublished opinion], *aff'd*, 2007 WL 4291021 (10th Cir. Dec. 7, 2007). *See also Niles*, 2007 WL 30607, at *13 ("Although the Plan does not require plaintiff to prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce her alleged disabling pain, the PBAC does not err in considering the objective evidence, medical or otherwise, that contradicts plaintiff's subjective allegations of pain."). Further, the Appeal Committee indicated that it had reviewed all the information submitted for the Plaintiff's claim, and it specifically relied on the opinions given by the PPR reviewing physicians that the Plaintiff could return to her prior occupation. The Appeal Committee was not required to give more weight to the evidence from the Plaintiff's own physicians, nor was it required to give much of an explanation for its decision not to do so. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) ("Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."). *See also Buckardt v. Albertson's, Inc.*, 221 Fed. Appx. 730,

---

relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv).

737 (10th Cir. 2007) ("'[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'") [unpublished opinion], *quoting Black & Decker*, 538 U.S. at 834. Deciding between contrary opinions does not result in a procedural irregularity. *See Grosvenor v. Qwest Communications International*, 191 Fed. Appx. 658, 662 (10th Cir. 2006) ("A serious procedural irregularity is not present every time a plan administrator comes to a decision adverse to the claimant on conflicting evidence. As such, we apply the 'pure' arbitrary and capricious standard.") [unpublished opinion].

### 2.    *Conflict of Interest*

The Plaintiff's contention that CBA's agreement with PPR created a biased review by PPR's reviewing physicians, *i. e.*, a conflict of interest, is also without merit. The burden is on the Plaintiff to show the existence of such a conflict, and she fails to meet it here. *See Fought*, 379 F.3d at 1005 (finding that it is plaintiff's burden to establish a conflict of interest). *See also Wolberg v. AT&T Broadband Pension Plan*, 123 Fed. Appx. 840, 845 (10th Cir. 2005) ("[T]he burden of proof is on the plaintiff to prove the existence of the conflict and to prove that any such conflict jeopardized the administrator's impartiality.") [citations omitted] [unpublished opinion]. The Plaintiff refers to the Clinical Review Services Agreement between CBA and PPR and documents which show that CBA asked PPR to conduct a review of the file and "give your opinion as to whether this person meets the attached plan language requirements for benefits during the first 24 months of benefits"

(both of which are not part of the administrative record submitted to the Court). The services agreement establishes that PPR will perform physician peer reviews to CBA for a fee. It also allows for CBA to terminate the agreement if PPR fails to perform its duties to the "reasonable satisfaction" of CBA. The Plaintiff contends that such an arrangement encourages PPR to recommend the denial of a claim. However, CBA's arrangement with PPR not only supports its "duty to all plan participants and beneficiaries to investigate claims and make sure to avoid paying benefits to claimants who are not entitled to receive them[,]" *see Davis v. UNUM Life Insurance Co. of America*, 444 F.3d 569, 575 (7th Cir.), *cert. denied*, __ U.S. __, 127 S.Ct. 234 (2006), but it also supports its obligation to the Plaintiff for a "full and fair review." *Id.* ("[A]n administrator's decision to seek[ ] independent expert advice is evidence of a thorough investigation. When an administrator . . . opts to investigate a claim by obtaining an expert medical opinion-independent of its own lay opinion and that of the claimant's doctors-the administrator is going to pay a doctor one way or another. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict.") [quotations and citations omitted]. Further, the Plaintiff has provided no evidence that PPR denies claims in order to maintain its service agreement with CBA. *See, e. g., Finley v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) ("Ms. Finley offers no evidence to show that VPA intended to save its customers money by increasing the number of denied claims. We reject her 'common sense' claim that such proof results from the fact that the Plan pays VPA. We do not expect VPA to work for free. While common sense

dictates that an insurer is more likely to retain a plan administrator if it reduces the number of approved claims, we find this general motivation, without more, insufficient to rise to the level of a legally cognizable conflict of interest."), *citing Pitman v. Blue Cross and Blue Shield of Oklahoma*, 217 F.3d 1291, 1296 (10th Cir. 2000). *See also Garner*, 2006 WL 894889, at *4 ("The Court agrees and determines that plaintiff has failed to carry her burden to establish an actual conflict of interest on the basis of the fee arrangement.") [citation omitted]; *Meraou v. The Williams Co. Long Term Disability Plan*, 221 Fed. Appx. 696, 703 (10th Cir. 2007) ("Although Ms. Meraou suggests that consultants employed by the Plan may have financial incentives to make a finding of 'not disabled,' the Supreme Court has recognized that contrary incentives may also motivate a claimant's treating physician.") [internal citations omitted] [unpublished opinion], *citing Black & Decker*, 538 U.S. at 832 ("[A] treating physician, in a close case, may favor a finding of 'disabled.'"). Thus, the Plaintiff has not shown that CBA's arrangement with PPR to provide it with independent physician peer reviews amounts to a conflict of interest warranting the supplementation of the administrative record or the application of a relaxed arbitrary and capricious standard of review. *See Davis*, 444 F.3d at 575 (finding that "the existence of potential bias, a potential conflict, is not enough to dislodge [the] ordinary arbitrary-and-capricious review.") [citations omitted].

In summary, the Court concludes that because no procedural irregularities or a conflict of interest were present in CBA's denial of the Plaintiff's claim, the supplementation of the administrative record is not warranted, the Plaintiff's Motion Objecting to the Administrative

Record Filed by the Defendants [Docket No. 35] is hereby denied, and the Court declines to apply the relaxed arbitrary and capricious standard of review. *See Garner*, 2006 WL 894889, at *5 ("[T]he Court has reviewed the administrative record and finds no evidence of purposeful irregularities or omissions that would warrant a less deferential standard of review."). *See also Layes*, 132 F.3d at 1251 ("Layes offers no evidence tending to show that the alleged irregularities caused a serious breach of CNA's fiduciary duties. In fact, he does not demonstrate that they affected CNA's decision whatsoever."). Further, even if the Court were to supplement the administrative record with the documents submitted by the Plaintiff, it is doubtful the Court would apply the relaxed standard of review as the foregoing discussion will show that CBA's decision to deny the Plaintiff's claim was supported by substantial evidence. *See Hickman*, 299 F.3d at 1215 ("[I]f after judicial review, it appears the administrator or fiduciary was correct in its decision, the court will uphold that decision even in light of a violation of Section 1133[.]").[5]

---

[5]     The Defendants requested that the Court supplement the administrative record with affidavits from CBA Director of Claims Administration Pam Zimbelman to help explain the supplemental documents the Plaintiff requested be included in the administrative record. Although such evidence may generally be considered if it explains how a decision was made, *see, e. g., Baker v. Tomkins Industries, Inc.*, 339 F. Supp. 2d 1177, 1182 (D. Kan. 2004) ("[D]efendants included an affidavit which was not part of the record reviewed by the Plan Administrator but which directly sheds light on the manner in which the Plan Administrator reached its decision. The Court will consider this document for the limited purpose of reviewing the manner in which the Plan Administrator made its decision."), it is not necessary for the Court to consider Ms. Zimbelman's affidavits in this case because no serious procedural irregularities or a conflict of interest were present in CBA's review of the Plaintiff's claim for LTD benefits.

## C. The "pure" arbitrary and capricious
## standard is the appropriate standard of review.

Under ERISA, "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), *citing* 29 U.S.C. § 1132(a)(1)(B). When discretionary authority is granted, the arbitrary and capricious standard is the appropriate standard of review in the case. *Id*. at 109-11 (noting that in an action brought under Section 1132 of ERISA, the discretionary functions of the fiduciary or administrator are reviewed under the arbitrary and capricious standard). *See also Woolsey v. Marion Laboratory, Inc.*, 934 F.2d 1452, 1457 (10th Cir. 1991); *Gaither v. Aetna Life Insurance Co.*, 394 F.3d 792, 801 (10th Cir. 2004). Here, both parties agree that the *de novo* standard of review is inapplicable to the Court's review of CBA's decision because the Plan designates CBA as the claims adjudicator and grants it discretion under the Plan to deny claims. Accordingly, the Court reviews CBA's denial of the Plaintiff's LTD benefits claim under the arbitrary and capricious standard of review.

The "pure" arbitrary and capricious standard "is a difficult one for a claimant to overcome." *Nance v. Sun Life Assurance Company of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002). "'When reviewing under the . . . standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary and capricious. The decision will be upheld unless it is not grounded on any reasonable basis. The reviewing court need

only assure that the administrator's decision falls somewhere on a continuum of reasonableness-even if on the low end.'" *Id.*, *quoting Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) [citations omitted]. *See also Adamson*, 455 F.3d at 1212. Further, the Court "will not set aside [an administrator's] decision if it was based on a reasonable interpretation of the plan's terms and was made in good faith." *Trujillo v. Cyprus Amax Minerals Co. Retirement Plan Committee*, 203 F.3d 733, 736 (10th Cir. 2000) [citations omitted].

"Indicia of arbitrary and capricious decisions include [a] lack of substantial evidence[.]" *Caldwell*, 287 F.3d at 1282, *citing Sandoval*, 967 F.2d at 380 n.4. "'Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" *Sandoval*, 967 F.2d at 382, *quoting Flint v. Sullivan*, 951 F.2d 264, 266 (10th Cir. 1991). Although "[s]ubstantiality of the evidence is based upon the record as a whole[,] [i]n determining whether the evidence in support of the administrator's decision is substantial, [the court] must 'take into account whatever in the record fairly detracts from its weight.'" *Caldwell*, 287 F.3d at 1282, *quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994) [quotation omitted].

### D. CBA's final decision was not arbitrary and capricious, unreasonable, or unsupported by substantial evidence.

The Plaintiff's argument that CBA's denial of LTD benefits was arbitrary and capricious can be summed up to the contention that the decision was based on the opinions of PPR's independent physicians and not the other substantial evidence in the record,

including the opinions from the Plaintiff's treating physicians. The Defendants, on the other hand, argue that CBA's determination was supported by substantial evidence in the administrative record and was therefore reasonable. As fully determined below, the Court finds that CBA's decision and review of the Plaintiff's claim for LTD benefits as a whole was not arbitrary or capricious, unreasonable, or unsupported by substantial evidence.

The record before CBA at the time it denied the Plaintiff's claim for LTD benefits included medical records from as early as 1985 with regard to the Plaintiff's treatment for chronic headaches; medical records from her treating physicians Dr. Traub and Dr. Bregman with regard to her chronic headaches and sleep apnea; two APS opinions from Dr. Traub, one from August 3, 2005, finding the Plaintiff was able to return to her job as a CAD technician, and another from September 20, 2005, finding she was unable to perform her job as a CAD technician or any other work; two FMLA certification forms completed by Dr. Traub, one on August 11, 2005, finding the Plaintiff needed two days off per month but could work, and another from August 23, 2005, finding the Plaintiff needed to be off work until further notice (following her bout with pancreatitis); and two reviews of the Plaintiff's medical records by independent physician reviewers, finding the Plaintiff was capable of performing the duties of her job as a CAD technician. In its letter denying the Plaintiff's final appeal, the CBA Appeal Committee referred to the definition of "totally disabled" from the Plan and indicated it "reviewed all information submitted in support of [the Plaintiff's] disability application." It specifically referred to portions of the reports by the independent medical consultants asked to review the Plaintiff's file, and it concluded that "[b]ased on their review of the file

and the opinions expressed by the consultants, the Appeal Committee has determined that [the Plaintiff] would not meet the plan definition of 'totally disabled' from her own occupation and would, therefore, not be eligible for disability benefits." (Tr. 137).

CBA did not act arbitrarily and capriciously in denying the Plaintiff's claim for LTD benefits by relying on the opinions from the independent PPR physicians (instead of the Plaintiff's treating physician) because the opinions were supported by substantial evidence in the administrative record. The opinions from the reviewing physicians indicate that the Plaintiff's condition was stable with treatment and that she was able to work even with her chronic headaches and sleep apnea.[6] Other than the APS completed by Dr. Traub, nothing in the administrative record indicates that the Plaintiff was disabled. Although the reviewing physician's opinions could have been more specific, their opinions were adequate for CBA's review of the Plaintiff's claim. *See Davis*, 444 F.3d at 578-79 ("[T]here is nothing in ERISA or our precedent requiring doctors to write like lawyers or plan administrators. . . . It is enough . . . for the doctors to review the file and render a professional, medical opinion. . . . In concluding otherwise-and penalizing Unum for relying on in-house doctors who

---

[6]      The Plaintiff contends that the reviewing physicians relied *solely* on her continuous work throughout the years as a reason for finding she was not disabled. *See*, *e. g.*, *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("Hawkins may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened. A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working."). But the physicians also relied on the improvement in the Plaintiff's condition due to treatment. *See Duncan v. Standard Insurance Co.*, 2007 WL 1231820, *slip op.* at *10 (E.D. Okla. Apr. 25, 2007) ("[T]he medical records in this case indicate Plaintiff continued to work while obtaining treatment which was effective. . . . This Court does not find the consulting medical experts' opinions were solely based upon a lack of change in Plaintiff's condition between the time she worked and the time she ceased working.") [unpublished opinion].

reviewed the file and gave doctor-like explanations for their conclusions-the district court went beyond the bounds of arbitrary-and-capricious review.").

Additionally, CBA was not required to rely on Dr. Traub's opinion even though he was one of the Plaintiff's treating physicians; it could adopt the opinions of the reviewing physicians instead of his. *See, e. g., Rose v. Cooperative Benefit Administrators, Inc.*, 2007 WL 1306457, at * 9 (E.D. Mo. May 2, 2007) ("Even if those conflicting medical opinions include one by a reviewing physician, the plan administrator may rely on that physician's contrary opinion, and need not defer to her treating physician[.]") [citations omitted] [unpublished opinion]. *See also Rutledge v. Liberty Life Assurance Co. of Boston*, 481 F.3d 655, 660 (8th Cir. 2007) ("'Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled.'"), *quoting Delta Family-Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 843 (8th Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002). Dr. Traub's opinion that the Plaintiff was disabled was inconsistent at best. His opinion of disability on the APS in September 2005 was given shortly after his prior determinations in August 2005 that the Plaintiff needed two days off per month because of her condition, she was still able to work as a CAD technician, and her condition was not expected to fundamentally change in the future. His September 2005 opinion was based not only on the Plaintiff's conditions of sleep apnea and chronic headaches but also on her pancreatitis and fibromyalgia. This further demonstrates the inconsistencies between Dr. Traub's opinions because the Plaintiff's pancreatitis had resolved by September 2005 and there is nothing in the record (including treatment notes

from Dr. Traub) showing that the Plaintiff has ever been diagnosed with fibromyalgia. *See, e. g.*, *Ralston*, 2006 WL 2917343, at *13 ("Unum's decision to give less weight to Dr. Glogas's opinion had rational support in the record, considering that his opinion concerning Ralston's pulmonary and return-to-work status seemingly 'flip-flopped' between July and October 2002."), *citing Davis*, 444 F.3d at 578 (concluding that a treating physician was acting "more as an advocate than a doctor rendering objective opinions" when he rendered inconsistent opinions); *Shyman*, 2004 WL 609280, at *19 (noting inconsistent opinions from the plaintiff's treating physician and finding that such "evidence is a sufficient basis for raising questions about the credibility of Dr. Robbins's assessment of the effect of plaintiff's headaches on plaintiff's ability to work."). *See also Rose*, 2007 WL 1306457, at * 9 ("Only in Dr. Park's APSD form is Plaintiff classified as totally disabled. This conclusion is internally inconsistent with his contemporaneous opinion that she could return to work with a weight-lifting restriction.") [citation omitted].

Further, to the extent the Plaintiff argues that CBA failed to provide an appropriate explanation for its denial of her claim, the Court finds that CBA's explanation was adequate, *i. e.*, the denial indicated that all the evidence was considered and referred specifically to the opinions from the reviewing physicians on which it placed the most weight. *See Gallo v. Amoco Corp.*, 102 F.3d 918, 922-23 (7th Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997) ("The administrator must give the 'specific reasons' for the denial, but that is not the same thing as the reasoning behind the reasons[.] . . . All he has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a good reason. To

require that would turn plan administrators not just into arbitrators, for arbitrators are not usually required to justify their decisions, but into judges, who are.") [internal citations omitted]. *See also Herman v. Central States, Southeast and Southwest Areas Pension Fund*, 423 F.3d 684, 692 (7th Cir. 2005) ("[T]his court will not substitute the conclusion it would have reached for the decision of the administrator, as long as 'the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts.'"), *quoting Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999), *cert. denied*, 529 U.S. 1068 (2000). Thus, the Court concludes that CBA's denial of the Plaintiff's claim for LTD benefits was supported by substantial evidence, was reasonable, and was not arbitrary and capricious. *See Davis*, 444 F.3d at 578 ("[T]he objective here is not to determine if Unum's decision is correct, but only if it is reasonable.").

### III. CONCLUSION

In summary, the Court finds: (i) that ECOEC is entitled to summary judgment because it is not a proper defendant to this ERISA action; (ii) that there were no procedural irregularities or a conflict of interest in CBA's handling of the Plaintiff's claim that warrant supplementation of the administrative record with additional evidence or the application of a relaxed arbitrary and capricious standard of review; and, (iii) that CBA's decision to deny the Plaintiff's claim for LTD benefits is supported by substantial evidence and is not arbitrary and capricious. Accordingly, the Motion for Summary Judgment by Defendants ECOEC, NRECA, CBA, and NRECA Group Benefits Program [Docket No. 46] is hereby GRANTED, and the Plaintiff's Motion Objecting to the Administrative Record Filed by

Defendants [Docket No. 35] and the Plaintiff's Motion for Summary Judgment and Opening Brief in Support [Docket No. 45] are hereby DENIED.  CBA's decision to deny the Plaintiff's claim for LTD benefits is hereby AFFIRMED.

**IT IS SO ORDERED** this 31st day of March, 2008.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**